DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**HEALTHY FOOD EXPERTS, LLC,**
Appellant,

v.

**AMGUARD INSURANCE COMPANY,**
Appellee.

No. 4D2025-0181

[June 10, 2026]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Elizabeth Ann Metzger, Judge; L.T. Case No. 432023CA001559CAAXMX.

Matthew Struble of StrubleCohen, Indialantic, for appellant.

Julius F. Parker, III of Butler Weihmuller Katz Craig LLP, Tallahassee, for appellee.

GERBER, J.

After the insurer paid a breach of contract jury verdict for the insured, the insured brought a bad faith action against the insurer for having failed to settle the claim pre-suit. The insurer filed a motion to dismiss the insured's bad faith action, and the circuit court granted that motion with prejudice. The circuit court, relying on *Fridman v. Safeco Insurance Co. of Illinois*, 185 So. 3d 1214 (Fla. 2016), reasoned that the insured's "damages [were] fixed by the judgment in the [breach of contract] [s]uit, which [the insurer] has paid," and that the insured could "recover no additional damages beyond those awarded in the [breach of contract] [s]uit."

On appeal, the insured argues the circuit court "erred by ruling that a jury verdict rendered in an underlying claim for contractual damages precludes a subsequent bad faith claim for extra contractual damages. ... Contrary to the [circuit] court's ruling, the finding in *Fridman*, that a damage determination in the underlying suit is binding, actually establishes ... a condition precedent to prosecute a first-party bad faith action." (internal quotation marks and citation omitted).

Applying de novo review, we agree with the insured's argument.  *See Carrasco v. Jimenez*, 419 So. 3d 640, 642–43 (Fla. 4th DCA 2025) ("When reviewing an order granting a motion to dismiss, we apply a de novo standard of review.").  Thus, we reverse the circuit court's final order dismissing the insured's bad faith action.

We present this opinion in five sections:
1. The insured's policy and claim;
2. The insured's breach of contract suit and civil remedy notice;
3. The insured's bad faith suit;
4. The parties' arguments on appeal; and
5. Our review.

## 1. *The Insured's Policy and Claim*

Our description of the insured's policy and claim is derived from the insured's operative bad faith complaint, which the circuit court was required to accept as true for purposes of considering the insurer's motion to dismiss.  *See Carrasco*, 419 So. 3d at 643 ("A motion to dismiss for failure to state a cause of action should be granted only if the movant can establish beyond any doubt that the claimant could prove no set of facts whatever in support of [the] claim.  This analysis requires the court [to] accept the facts alleged therein as true and to draw all [reasonable] inferences … in favor of the pleader.") (alteration in original; internal citations and quotation marks omitted).

The insurer issued a commercial insurance policy covering the insured's restaurant.  The policy included coverage for business personal property (up to $30,000), business income (up to $1,000,000), and food spoilage (up to $10,000).  The policy also covered direct physical loss or damage caused by "collapse," including collapses caused by "[d]ecay that is hidden from view" and "[u]se of defective material or methods in construction" which contributed to the collapse.

While the policy was in effect in 2017, the restaurant's dining area ceiling collapsed.  The fire department deemed the property to be unsafe.  Later that day, the insured reported the claim to the insurer.

The insurer hired an engineer to inspect the property.  The engineer's report pertinently concluded:  (1) "[t]he ceiling damage occurred when the wood substructure supporting the outer layer of drywall ceiling finishes became detached from the supporting plaster ceiling"; (2) "[t]he detachment of the wood substructure from the supporting plaster ceiling can be attributed to improperly fastening the wood substructure to the

wood roof rafters"; and (3) "the observed ceiling damage was a sudden and accidental occurrence" and "there did not appear to be any physical evidence that would have indicated that the displacement of the ceiling finishes was imminent."

The engineer's findings and observations were included in a report which the insurer's field adjuster submitted to the insurer. The field adjuster's report ultimately concluded "the cause of this loss was due to improper installation of the drywall ceiling." The field adjuster estimated the insured's recoverable losses at $60,000, which included $16,000 in business personal property, $30,000 in gross sales, $10,000 in food spoilage, and $4,000 in fine arts. The field adjuster's report also noted the insured had reported $45,687.90 in food spoilage and $190,070 in lost business income. The field adjuster asked the insurer to "advise if you will be extending coverage to this loss."

Two months later, the insurer sent the insured a letter denying coverage for the insured's losses for business personal property and business income. The insurer stated it would provide coverage for only the insured's food spoilage losses. The insurer's letter did not include the engineer's or the field adjuster's reports or otherwise notify the insured of the engineer's and the field adjuster's conclusions.

## 2. *The Insured's Breach of Contract Suit and Civil Remedy Notice*

In 2018, the insured sued the insurer for breach of contract. That action went to trial in 2022. The jury found defective construction and hidden decay had caused the collapse. The jury also found the "value of the damages sustained by [the insured] as a result of the subject loss" was $31,330. The verdict form did not request the jury to attribute that value to any specific loss type. Following the circuit court's entry of final judgment for the insured based on the jury's verdict, the insurer appealed.

While the insurer's appeal was pending, the insured filed a civil remedy notice ("CRN") with the Florida Department of Financial Services. The insured's CRN alleged the following statutory violations: (1) a section 624.155(1)(b)1. violation for "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests"; (2) a section 626.9541(1)(i)3.a. violation for "[f]ailing to adopt and implement standards for the proper investigation of claims"; (3) a section 626.9541(1)(i)3.b. violation for "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue"; (4) a section 626.9541(1)(i)3.d. violation for "[d]enying claims without conducting

reasonable investigations based upon available information"; (5) a section 626.9541(1)(i)3.f. violation for "[f]ailing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement"; and (6) a section 626.9541(1)(i)3.g. violation for "[f]ailing to promptly notify the insured of any additional information necessary for the processing of a claim."

The insured's CRN alleged the following facts supported the violations:

> [The insurer] denied the claim by representing that its [a]djuster and [e]ngineer [had] determined the claim was not covered.

> When [the field adjuster's and the engineer's] reports were eventually obtained, after the claim was denied and after years of litigation, it was revealed that [the insurer's] denial omitted pertinent portions of the reports. First, the [e]ngineer actually concluded that the collapse was a "sudden and accidental occurrence" … Second, the [e]ngineer concluded that prior to the collapse[,] the [insured] was not aware of any ceiling cracks or ceiling water stains (decay that is hidden or unknown). The [e]ngineer confirmed the [insured's] statement that the damage was unknown prior to the collapse because the deteriorated drywall was behind the ceiling and not visible. The [e]ngineer identified contributing causes, including visible mold growth and deteriorated drywall. [The insurer] concealed this information, despite the information from its own [a]djuster and [e]ngineer establishing coverage for the claim pursuant to the Additional Coverage for Collapse.

> A jury confirmed coverage for the claim and awarded damages for $31,330. Instead of paying the judgment, [the insurer] has filed an appeal ….

> As a result of [the insurer's] actions, including wrongful denial, concealing information, claim delay, and not adjusting the amount of the claim … *the [insured] sustained significant uninsured losses …. The insurer can cure this [CRN] by issuing payment for the judgment plus interest.*

(emphasis added).

4

The insurer did not pay the CRN's requested cure amount within the statutory sixty-day cure period. *See* § 624.155(3)(d), Fla. Stat. (2017) ("No action shall lie if, within 60 days after filing notice, the damages are paid or the circumstances giving rise to the violation are corrected.").

In 2023, without written opinion, we per curiam affirmed the underlying breach of contract judgment against the insurer. *AmGUARD Ins. Co. v. Healthy Food Experts, LLC*, 357 So. 3d 680 (Fla. 4th DCA 2023).

### 3. *The Insured's Bad Faith Suit*

Later in 2023, the insured sued the insurer for first-party bad faith. The bad faith suit's allegations largely mirrored the CRN's allegations. The insured further alleged that, based on the insurer's statutory violations referenced in the CRN, and the insurer's failure to pay the CRN's stated cure amount within the statutory sixty-day period, the insured had suffered "extra-contractual damages."

The insurer filed a motion to dismiss the insured's bad faith suit for failure to state a cause of action. The insurer pertinently alleged: "Following the appeals court's *per curiam* affirmance, [the insurer] paid [the] judgment in full with accrued interest." Based on that allegation, the insurer argued dismissal was required under *Fridman*, 185 So. 3d at 1216 ("[A]n insured is entitled to a determination of liability and the full extent of his or her damages in the [uninsured motorist] action before filing a first-party bad faith action. That determination of damages is then binding, as an element of damages, in a subsequent first-party bad faith action against the same insurer so long as the parties have the right to appeal any properly preserved errors in the verdict."). The insurer also argued dismissal was required because the insured's breach of contract judgment did not exceed the insured's policy limits, which the insurer maintained was a required element of a first-party bad faith claim.

Following a hearing, the circuit court entered a final order dismissing the insured's bad faith action with prejudice:

> [A]pplying … *Fridman*, where first-party damages are fixed by verdict and judgment, such damages are binding on this subsequent bad faith action brought by [the insured] per the Complaint. [The insured] litigated its damages against [the insurer] in the 2018 Suit, and if [the insured] believed the jury verdict … [was] in error ("if the verdict were less than anticipated"), [the insured] had a right to appellate review of the damages; [the insured] did not do so. … [The insured]

5

cannot now seek a "second bite at the apple" to relitigate its first-party insurance contract damage claims through the [bad faith suit]. ... [T]herefore, [the insured's] damages are fixed by the judgment in the 2018 [breach of contract] [s]uit, which [the insurer] has paid.

[The insured's bad faith suit] only seeks damages for "statutory bad faith" claims due to alleged violations of sections 624.155(1)(b)[1.] and 626.9541(1)(i)3[.], Florida Statutes [(2017)], and the Court has determined that [the insured] can recover no additional damages beyond those awarded in the 2018 [breach of contract] [s]uit, applying *Fridman's* rationale. ... [The insured] cannot prove any set of facts to state a cause of action for additional damages based on bad faith.

The insured filed a motion for rehearing. The rehearing motion pertinently argued the insurer's "wrongful claim denial caused damages that could not have been requested in the trial of contractual damages ...." The circuit court summarily denied the insured's rehearing motion.

### 4. *The Parties' Arguments on Appeal*

This appeal followed. The insured pertinently argues:

The trial court's order is the opposite of Florida law, which requires that contractual damages in a first-party property insurance claim be fixed by verdict and judgment (or confession of judgment) as a pre-requisite to brin[g]ing a subsequent bad-faith claim for extracontractual damages. Contrary to the trial court's ruling, the finding in *Fridman* that a damage determination in the underlying suit is binding actually establishes that "a condition precedent to prosecute a first-party bad faith action" is satisfied. *Cingari v. First Protective Ins. Co.*, 377 So. 3d 1169, 1174 (Fla. 4th DCA 2024). Clearly, an underlying jury verdict cannot preclude a subsequent bad faith claim, when obtaining a verdict in the underlying contractual claim is a specified prerequisite for bringing a bad faith claim.

....

The "binding" language in *Fridman* serves one purpose: to prevent parties from getting a "second bite at the apple" by re-

litigating the same damages. *Fridman,* 185 So. 3d at 1225. The concern is preventing re-litigation of what the covered loss was worth—the contractual damages. In the [uninsured/underinsured motorist] context of *Fridman,* the jury verdict determined the full extent of damages from the underlying accident, capped at policy limits by law.

That context does not apply here. [The insured] is not seeking to re-litigate the $3[1],330 in contractual damages. [The insured] accepts that verdict. Instead, [the insured] seeks entirely different damages—extra-contractual damages caused by [the insurer's] bad faith conduct ....

These are not the "same" damages—they are consequential damages from [the insurer's] bad faith.

(record citations omitted).

The insurer summarizes its response as follows:

The trial court correctly followed *Fridman* ... which involved virtually identical facts. *Fridman* controls because it involved a jury trial in which the insurer had an opportunity to present evidence on the question of damages and an opportunity to appeal any perceived errors in the trial. As such, the jury verdict rendered in the breach of contract action sets the measure of damages in this attempted bad-faith claim. Since those damages do not exceed the ... policy's limits, no bad faith claim can exist as a matter of law.

### 5. *Our Review*

a. First-Party Bad Faith Actions Generally

"The Florida Legislature created the first-party bad faith cause of action by enacting section 624.155, Florida Statutes, which imposes a duty on insurers to settle their policyholders' claims in good faith." *Cingari,* 377 So. 3d at 1173. "The statutory obligation on the insurer is to timely evaluate and pay benefits owed under the insurance policy. The damages recoverable by the insured in a bad faith action are those amounts that are the reasonably foreseeable consequences of the insurer's bad faith in resolving a claim, which include consequential damages." *Id.* (internal citations omitted). "[S]uch damages may include, but are not limited to,

interest, court costs, and reasonable attorney's fees incurred by the plaintiff." *Cont'l Ins. Co. v. Jones*, 592 So. 2d 240, 241 (Fla. 1992).

"As a condition to bringing such a bad faith action, Florida's Department of Financial Services and the insurer must be given sixty days' written notice of the claim." *Demase v. State Farm Fla. Ins. Co.*, 239 So. 3d 218, 221 (Fla. 5th DCA 2018). "The sixty-day window is designed to be a cure period that will encourage payment of the underlying claim, and avoid unnecessary bad faith litigation. This cure period allows the insurer a final opportunity to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed." *Id.* (internal citations and quotation marks omitted).

"[I]f an insurer fails to respond to a civil remedy notice within the sixty-day window, there is a presumption of bad faith sufficient to shift the burden to the insurer to show why it did not respond." *Id.* (citations and internal quotation marks omitted) (alteration in original). If, however, "the insurer pays the [contractual] damages during the cure period, then there is no [bad faith] remedy [for the insured]." *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1284 (Fla. 2000).

Accordingly, "a statutory bad faith claim under section 624.155 is ripe for litigation when there has been (1) a determination of the insurer's liability for coverage; (2) a determination of the extent of the insured's [contractual] damages; and (3) the required [civil remedy] notice is filed pursuant to section 624.155(3)(a)." *Demase*, 239 So. 3d at 221.

b. *Fridman* in Detail

Here, in dismissing the bad faith action on the basis that the insured's damages were "fixed" by the judgment entered in the breach of contract action, and that the insured could "recover no additional damages beyond those awarded in the [breach of contract action]," the circuit court relied on *Fridman*. However, the circuit court misapplied *Fridman*.

*Fridman*—unlike the instant case, which concerns a property insurance policy—addressed whether an insured was entitled to a determination of liability and the full extent of damages in an uninsured/underinsured motorist ("UM/UIM") action before pursuing a first-party bad faith claim under section 624.155. 185 So. 3d at 1215. The case arose after the insured filed a claim with his insurer for the UM policy's $50,000 limits, based on having been injured in an automobile accident with an underinsured motorist. *Id.* at 1216. The insurer refused to pay the policy limits, and the insured filed a CRN. *Id.* After the insurer had failed to

respond to the CRN, the insured sued the insurer to determine liability under the UM/UIM policy and the full extent of damages. *Id.* Before trial, the insurer tendered the $50,000 policy limits and filed a motion for entry of confession of judgment. *Id.* at 1217. The insured opposed entry of a confessed judgment, arguing "a jury verdict would determine the upper limits of [the insurer's] potential liability under a future bad faith claim." *Id.* The circuit court denied the insurer's motion to confess judgment. *Id.*

The case proceeded to trial, where a jury determined the underinsured driver involved in the accident was negligent and one hundred percent responsible for the insured's damages, which the jury determined to be $1,000,000. *Id.* The circuit court thereafter entered a final judgment awarding $50,000 (the policy limits) to the insured, and reserving jurisdiction to determine the insured's right to amend the complaint to seek bad faith damages. *Id.* at 1217–18. The final judgment also stated: "If the [insured] should ultimately prevail in his action for bad faith damages against [the insurer], then the [insured] will be entitled to a judgment, in accordance with the jury's verdict, for his damages in the amount of $980,072.91 plus interest, fees and costs." *Id.* at 1218.

The insurer appealed to the Fifth District, arguing, among other things: "(1) the trial court should have granted [the insurer's] motion for entry of confession of judgment; [and] (2) the final judgment was void because the trial court had no authority to reserve jurisdiction in the judgment to allow an amendment to the pleadings or establish [the insured's] damages to be awarded in a future bad faith action." *Id.*

The Fifth District agreed with the insurer, vacated the jury's verdict, and directed the circuit court to enter an amended final judgment deleting any reference to the jury verdict or reserving jurisdiction to consider the insured's bad faith claim. *Id.* The Fifth District reasoned that where no dispute exists as to the policy limits or available coverage, the amount of the judgment in the UM case may not exceed the policy limits. *Id.* According to the Fifth District, when the insurer confessed judgment for the policy limits, "the issues between the parties, as framed by the pleadings, became moot." *Id.* Instead of proceeding to trial, the Fifth District explained, "the trial court should have merely entered the confessed judgment [for the insured], reserving jurisdiction to award costs, prejudgment interest, and, if authorized by law, reasonable attorney's fees." *Id.* The Fifth District reasoned this "would provide [the insured] a sufficient basis to pursue a bad faith claim against [the insurer]," because "[the insured] can seek the full measure of damages afforded by [section 627.727(10)] in a subsequent bad faith action." *Id.* (alteration in original).

9

The Florida Supreme Court quashed the Fifth District's decision, reasoning: "[A]n insured is entitled to a determination of liability and the full extent of his or her damages in the UM action before filing a first-party bad faith action. That determination of damages is then binding, as an element of damages, in a subsequent first-party bad faith action against the same insurer so long as the parties have the right to appeal any properly preserved errors in the verdict." *Id.* at 1216. Regarding the verdict's binding effect in a first-party bad faith action, the Supreme Court explained:

> First, it is obvious that the UM verdict to which the insured is entitled must be binding in the bad faith action. Because a determination of the full extent of the insured's damages is one of the prerequisites to a bad faith cause of action, to preclude a UM verdict in excess of the policy limits from being used in the bad faith case would force the parties to relitigate the issue of damages a second time prior to the bad faith trial. …
>
> If the amount of the UM verdict is not binding as an element of damages in the bad faith litigation, it would allow the insurer—or the insured, if the verdict were less than anticipated—a second bite at the proverbial apple. …

*Id.* at 1224–25. The Supreme Court also noted "that an element of damages within the first-party bad faith case would be any damages in excess of the policy limits for the injuries arising from the automobile accident." *Id.* at 1221–22.

In sum, the Supreme Court's *Fridman* opinion stands for two propositions in UM/UIM actions: (1) parties cannot challenge the damages awarded in the underlying breach of contract action in a subsequent first-party bad faith action if the parties had the opportunity to appeal the judgment; and (2) if the judgment in the underlying breach of contract action exceeds the policy limits, the excess damages can be sought as an element of damages within the first-party bad faith action, along with any other consequential damages proximately caused by the insurer's bad faith in resolving the contractual claim. *See id.* at 1224–25.

These propositions do not neatly carry over to first-party property insurance actions. In UM/UIM bad faith actions, unlike in property insurance actions, the damages recoverable include "the amount in excess

10

of the policy limits." § 627.727(10), Fla. Stat. (2017).[1] That is why the insured, in a breach of contract action, is "entitled to a determination of liability and the full extent of his or her damages before litigating the first-party bad faith claim." *Fridman*, 185 So. 3d at 1222. For example, in *Fridman*, the insured had a $50,000 policy limit, and the jury determined her actual damages from the accident were nearly $1 million. Hence, she was entitled to seek that $950,000 excess as damages in a subsequent bad faith action, even though the insurer could not be liable for more than the $50,000 policy limit in the breach of contract action.

By contrast, in first-party property insurance actions, no mechanism allows the insured to recover actual damages—that is, the amount of property damage—in excess of the policy limit in the subsequent bad faith action. So if the insured had a $50,000 policy limit, yet suffered a $1 million actual loss to his or her property, the insured could recover at most $50,000 in the breach of contract action, but could not seek to recover his or her actual property damage in a subsequent bad faith action. *See Citizens Prop. Ins. Corp. v. Manor House, LLC*, 313 So. 3d 579, 582 (Fla. 2021) ("[E]xtra-contractual, consequential damages are not available in a first-party breach of insurance contract action because the contractual amount due to the insured is the amount owed pursuant to the express terms and conditions of the policy."). In a subsequent bad faith action, the insured could seek extra-contractual damages incurred *as a consequence* of the insurer's failure to pay the $50,000 to which the insured was entitled, but could not recover the additional $950,000 in property losses. *See id.* ("Extra-contractual damages are available in a separate bad faith action pursuant to section 624.155 ...."); *Jones*, 592 So. 2d at 241 ("[T]he damages recoverable in a first-party bad faith suit under section 624.155, Florida Statutes (1989), are those damages which are the natural, proximate, probable, or direct consequence of the insurer's bad faith.").

c. Application Here

Here, the insured's first-party bad faith action under section 624.155 was ripe for litigation because the insured had established: "(1) a determination of the insurer's liability for coverage; (2) a determination of the extent of the insured's [contractual] damages; and (3) the required [civil remedy] notice [was] filed pursuant to section 624.155(3)(a)." *Demase*, 239 So. 3d at 221.

---

[1] In 2023, the Legislature recodified this provision as section 627.727(9), Florida Statutes (2023).

Although the insured's bad faith action could not seek contractual damages which were litigated, or could have been litigated, in the insured's breach of contract action, the insured's bad faith action could seek "extra-contractual damages" which were not recoverable in the insured's breach of contract action. *See Manor House*, 313 So. 3d at 582 ("[E]xtra-contractual, consequential damages are not available in a first-party breach of insurance contract action because the contractual amount due to the insured is the amount owed pursuant to the express terms and conditions of the policy. Extra-contractual damages are available in a separate bad faith action pursuant to section 624.155 ...."); *Jones*, 592 So. 2d at 241 (extracontractual "damages may include, but are not limited to, interest, court costs, and reasonable attorney's fees incurred by the [insured]").

Indeed, as the insured correctly argues, "[c]laim handling evidence and bad faith allegations are inadmissible in breach of contract actions, confirming these issues could not have been litigated in the underlying [breach of contract] case." *See generally Universal Prop. & Cas. Ins. Co. v. Naze*, 417 So. 3d 313, 314–20 (Fla. 4th DCA 2025) (claims handling evidence inadmissible in breach of contract action as being irrelevant and prejudicial). As such, as the insured argues, the "the resulting extra-contractual damages [flowing from the insurer's alleged bad faith conduct] could not have been—and were not—litigated in the underlying [breach of contract] case."

Further, while the insurer belatedly paid the CRN's cure amount only after we had affirmed the underlying breach of contract judgment, the insurer's late payment did not preclude the insured's bad faith action. We are not aware of any authority which permits an insurer to extend section 624.155(3)(c)'s sixty-day cure period by appealing the underlying breach of contract judgment.

The insurer also misstates that an excess judgment in the underlying breach of contract action is an essential element of a *first-party* bad faith claim. On the contrary, excess judgments are not available in a breach of contract action in first-party property insurance claims. *See Manor House*, 313 So. 3d at 582 ("[T]he contractual amount due to the insured is the amount owed pursuant to the express terms and conditions of the policy.").

The primary case upon which the insurer relies involved a *third-party* bad faith claim. *See Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994) ("Under ordinary circumstances, *a third party* must obtain a judgment against the insured in excess of the policy limits before

prosecuting a bad-faith claim against the insured's liability carrier.") (emphasis added). Third-party actions differ significantly from first-party actions. *See Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 457 (Fla. 2006) ("[T]he difference between first-party and third-party bad faith causes of action is critical."). "[A] third-party bad faith cause of action arises when the insurer fails to act in good faith in handling a claim brought by a third party against an insured, whereas a first-party bad faith cause of action arises when an insurer fails to act in good faith in the processing of the insured's own first-party claim." *Id.* As *Cunningham* recognized, "the essence of a third-party bad-faith cause of action is to remedy a situation in which an insured is *exposed to an excess judgment* because of the insurer's failure to properly or promptly defend the claim." 630 So. 2d at 181 (emphasis added).

"Such is not the case in a first-party action, because the insured is not injured by the excess judgment amount." *McLeod v. Cont'l Ins. Co.*, 591 So. 2d 621, 624 (Fla. 1992), *superseded on other grounds by* ch. 92-318, § 79, Laws of Fla., *as recognized in Fridman*, 185 So. 3d at 1221; *see also Barton v. Cap. Preferred Ins. Co.*, 208 So. 3d 239, 243–44 (Fla. 5th DCA 2016) (holding, in a first-party bad faith action, that "[section 624.155] does not condition the right to bring an action on the insured's recovery of the policy limits"); *Cingari*, 377 So. 3d at 1171–75 (the insurer's payment of the policy limits in the underlying suit seeking the appointment of an umpire did not preclude the homeowner's first-party bad faith action wherein the homeowner sought damages for having to sell the property at a loss due to the insurer's bad faith conduct).

### *Conclusion*

Based on the foregoing, we conclude the circuit court erred in dismissing the insured's bad faith action. Thus, we reverse the circuit court's final dismissal order. We remand for the circuit court to reinstate the insured's bad faith action. The insured's bad faith action may seek extra-contractual damages which were not recoverable in the insured's breach of contract action. *Manor House*, 313 So. 3d at 582. The insured's bad faith action may not seek contractual damages which were litigated, or could have been litigated, in the insured's breach of contract action. *Id.*

*Reversed and remanded for proceedings consistent with this opinion.*

CIKLIN and LOTT, JJ., concur.

\*　　　\*　　　\*

*Not final until disposition of timely-filed motion for rehearing.*